THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL GORE, Defendant-Appellant.

First District (6th Division) No. 1—88—2969

Opinion filed April 19, 1991.

Randolph N. Stone, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Daniel Rabinovitz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Defendant-appellant Daniel Gore was charged with two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)) and one count of armed violence. Defendant was tried before a jury. The latter charge was nol-prossed at the conclusion of the State's case. The jury was instructed on self-defense, first degree murder and both forms of second degree murder. The jury returned a verdict of guilty of first degree murder, and defendant was sentenced to a term of imprisonment of 28 years in the Illinois Department of Corrections. Defendant raises two issues on appeal, namely: (1) whether he was denied a fair trial due to the State's eliciting testimony that defendant often carried a knife and had threatened others with the knife before; and (2) whether the Illinois statutory homicide scheme is unconstitutional as violative of due process and equal protection guarantees and violative of the Illinois Constitution's separation of powers mandate. We affirm.

The testimony elicited at trial is as follows. Defendant, the victim, Rodney Giles, and all of the occurrence witnesses who testified lived

in a rooming house located at 11747 South Michigan Avenue in Chicago. Johnny Macon testified that on December 10, 1987, he, the defendant and Giles were standing at the top of the second-floor landing of a staircase at the rooming house. The men had been drinking whiskey and beer and were preparing to shoot dice. Defendant and Giles began arguing over whether defendant owed Giles a dollar.

Defendant and Giles began to wrestle. In the course of this scuffle, Giles pushed defendant down the flight of stairs. Defendant fell to the bottom of the staircase, which Macon testified was a distance of about 20 stairs. Charles Holmes and Sena Allen lived in a room on the first floor. Both testified that they heard a bumping noise in the hallway. Allen testified that she opened her door and saw defendant getting up off the floor at the bottom of the staircase, and that she saw Giles and Macon standing at the top of the stairs. Allen heard defendant and Giles arguing about the dollar and both men were upset.

Allen further testified that she saw Giles go to his room and get a board. She saw defendant go to his room to get a knife, and she saw defendant place this knife in his belt. Allen informed the victim that defendant had a knife. Defendant, according to Allen, told Giles to come down the stairs, and said that he (defendant) did not have a knife. Giles put the board down and came down the stairs empty-handed.

At this point, according to Sena Allen, Giles walked past defendant and went into the room defendant shared with Leslie Sandrella. Giles asked Sandrella to confirm the fact that defendant owed Giles a dollar. Sandrella refused to do this and Giles left her room. Allen and Holmes were still standing in the hallway. Giles started to walk up the stairs when defendant reached around Giles and stabbed him in the abdomen. As Giles crawled up the stairs, defendant then ran into his room and returned with an iron pipe. Defendant then dropped the knife and ran.

Charles Holmes' testimony was consistent with Sena Allen's testimony. Holmes saw defendant pulling the knife out of Giles' body.

Cynthia Allen, Sena Allen's daughter, testified that she lived on the second floor with Giles. She heard Giles and defendant arguing, and Giles came into their room and got a board. As the two men argued, Cynthia Allen went down to the first floor. Cynthia Allen also testified that when Giles went down the stairs, he had previously put the board down and did not have a weapon on him. Though she did not see the actual stabbing, when she turned around, she saw defendant holding a knife which was dripping blood.

An ambulance was called and Giles was taken to the hospital, where he died at 6 p.m. Giles had a four- to five-centimeter wound in the lower part of his abdomen. This stab wound, the medical examiner testified, was the cause of Giles' death.

Leslie Sandrella testified on behalf of the defendant. She had been living with the defendant for two months prior to the incident. Previously that day, Giles had come by Sandrella's room, looking to shoot dice with defendant. When defendant returned, he went to join Giles and Macon at the second-floor landing to gamble. Sandrella testified that she was standing at the bottom of the steps and heard the argument between defendant and Giles. Giles went to his room and returned with a bed slat, and, according to Sandrella, struck defendant with the board, knocking defendant down the stairs. Sandrella testified that she was helping defendant to his feet when Giles came down the stairs with a knife.

Sandrella was standing between Giles and defendant, and Giles began poking at defendant with the knife. After she stepped from in between the two men, Sandrella saw defendant "punch" Giles. She did not see a knife in defendant's hand. At this point, Giles dropped the knife and defendant fled. Sandrella says that she took the knife to her room, and when she went upstairs, she learned that Giles had been stabbed.

Sandrella further testified that she was the only spectator to the occurrence who was in the hallway. She claimed that when she later informed Holmes about the stabbing, he told her that Giles was his friend and that if she told the police what had happened she would be harmed. Holmes left, taking Giles' knife with him. Sandrella admitted that she lied to the police about the incident the day of the incident and the next day. On those occasions, she told the police that she was in her room during the incident and did not see it. The reason she lied, she testified, was that she was afraid due to Holmes' threat. Though she moved out of the building three days after the incident, she never went to the police to tell them the truth.

Willa Jeter also testified for the defendant. She was in her second-floor room when she heard arguing. She went to her door and saw defendant fall down the stairs. She saw Giles pick up a board and threaten defendant with it, but Giles agreed to drop the board. According to Jeter, defendant went to his room, and then Giles went to defendant's room and knocked on the door. Jeter did not see the stabbing. She did testify that she saw Macon and the Allens in the first-floor hallway. Jeter did not see Sandrella in the hallway, and did not see a knife in Giles' hand.

In rebuttal, Holmes denied threatening Sandrella. Two assistant State's Attorneys testified that Sandrella never told them that Giles had a knife, that she picked the knife up, or that Holmes threatened her and took the knife.

During the State's case, both Holmes and Sena Allen were allowed to testify that they had often seen defendant with the knife before the incident. During cross-examination of Sandrella, she was asked if she had seen defendant with the knife before. During Sena Allen's testimony, when she was asked if she had ever seen the knife before, she responded "Well, before that, he [defendant] attempted to cut me with it." Defense counsel objected to this answer, and the jury was instructed to disregard it. During Sandrella's cross-examination, she was asked if defendant had threatened Sena Allen with the knife. An objection by defense counsel was sustained. Sandrella was then asked if defendant had threatened her with the knife. Again, defense counsel's objection was sustained.

We first address whether defendant was denied a fair trial by the State's eliciting testimony that defendant often carried a knife and that defendant had threatened others with the knife on prior occasions. Defendant points out that in opening argument, in the State's case in chief, during cross-examination and during closing argument, the State emphasized that defendant often carried a knife—the knife defendant stabbed Giles with.

Specifically, in opening argument, the prosecutor stated that defendant carried a knife "all the time." Sena Allen was allowed to testify that she had observed the knife before. She described it as a "knife you use in the kitchen. I call it a butcher knife." Allen said that the knife was about eight inches long, and that she had seen it before because defendant "would usually wear it everyday." When Charles Holmes was asked if he had previously seen the knife he saw defendant pulling from Giles' body, he testified that defendant wore it "all the time." At this point an objection was sustained, although no reason was given for the objection, and the trial judge offered no reason for sustaining the objection. Next, the prosecution was allowed to elicit, without objection, that Holmes had seen the knife on several occasions before. During the cross-examination of Leslie Sandrella, the prosecution asked whether defendant carried the knife with him all the time. Sandrella responded that defendant had some type of knife, but not a butcher knife. Defendant's objection to this question and/or answer was overruled. Finally, during closing argument, the State again emphasized that defendant carried the knife all of the time.

A pertinent fact that defendant has not mentioned in his brief is that it was stated in defendant's opening statement that, as Leslie Sandrella stated, the evidence would show that Giles came down the stairs at defendant with the knife.

During Sena Allen's cross-examination, after she had been asked and she had confirmed that she had closely observed the knife before, the prosecutor asked her when this was. She replied: "Well, before that, he attempted to cut me with it." Defense counsel immediately objected. The trial court sustained the objection and instructed the jury to disregard the answer. During the cross-examination of Leslie Sandrella, the prosecutor asked Sandrella if defendant had threatened Sena Allen with the knife. Defense counsel's objection to this question was sustained. Immediately thereafter, the prosecutor asked Sandrella if defendant had ever threatened her (Sandrella) with the knife. Again, a prompt objection was sustained.

■ ■ With respect to the testimony elicited as to defendant's having previously carried the knife, defendant asserts that this information was irrelevant, and that this testimony was elicited to show that defendant was the type of man who was ready for trouble at any time. Relevancy is defined, however, as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. (See *People v. Free* (1983), 94 Ill. 2d 378, 413, 447 N.E.2d 218.) Here, defendant himself asserted in his opening statement that the evidence would show not (as the State had asserted) that defendant went to get his own knife, but that the victim came down the stairs after defendant with the knife in his hand (as Sandrella later in fact testified to). Thus, the evidence that defendant was often in possession of a knife was relevant with respect to two factual issues. First, the evidence made it more probable that defendant was in possession of the knife, as the State's witnesses asserted, at the time of the stabbing. Second, the evidence made it more probable that defendant retrieved his own knife and used it in slaying Giles, as opposed to the testimony of Sandrella, which led to the inference that Giles attacked defendant with a knife that was not defendant's. The testimony relating to ability to recognize the knife as well could serve to bolster the witnesses' credibility on these issues. We feel that the trial court's refusal to exclude evidence relating to defendant's previous possession of the knife was not an abuse of the trial court's discretion.

■ The State does not dispute that Sena Allen's response that defendant had tried to cut her with the knife before was properly

stricken, and the State concedes that it was error for the prosecutor to ask Sandrella both whether she knew that defendant had threatened Allen with the knife and whether defendant had threatened her with the knife. As to the comment by Allen, it has been observed that "[a]n instruction to disregard evidence ordinarily cures error in its admission." (*People v. Johnson* (1973), 11 Ill. App. 3d 745, 749, 297 N.E.2d 683.) Here, defense counsel promptly objected to Allen's statement, the trial judge promptly sustained the objection, and moreover, at the close of evidence the trial court instructed the jury to disregard all stricken evidence. As such, we feel that the remark by Allen as to defendant's prior threatening conduct was substantially relieved of its prejudicial effect.

■ Similarly, each of the questions to Sandrella that defendant claims deprived him of a fair trial was promptly objected to, and the objections were promptly sustained. While the asking of the questions was error, as the State concedes, we conclude that the error was harmless. Errors will be held harmless when they could not reasonably have affected the result or contributed to defendant's conviction. (See *People v. Sullivan* (1978), 72 Ill. 2d 36, 377 N.E.2d 17.) Here, the corrective action of the trial judge is a factor contributing to the harmlessness of the error. See *People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367.

Moreover, we do not feel that the evidence in this case was close. Sandrella's version of the events that took place up to and including the stabbing was contradicted by every witness, including another defense witness, Willa Jeter. Sandrella said that she alone was in the hallway. All of the occurrence witnesses, including Jeter, refuted this. Sandrella said that none of the other witnesses were in the hallway. All of the other witnesses, including Jeter, refuted this. Sandrella said that Giles came down the stairs after defendant with a knife. All of the other witnesses, including Jeter, refuted this as well. Sandrella's story that she lied to the police because of Holmes' threat was not only impeached by Holmes, but was unbelievable in that Sandrella never brought the truth to the authorities' attention, even though Sandrella moved away from the rooming house and Holmes three days after the occurrence. The proof of defendant's guilt was overwhelming—another factor which contributes to our holding that the error of inquiring into defendant's prior threatening conduct with the knife was harmless.

■ At oral argument, defense counsel stressed that the issue which was close in this case was whether the mitigating factor of provocation existed. To the contrary, as the above discussion illus-

trates, whether defendant was seriously provoked and acting under a sudden and intense passion was not a close issue. While uncontradicted evidence established that defendant was pushed down a flight of stairs, the evidence also established that after this, defendant went to his room to get his knife, returned to the staircase and coaxed Giles down the stairs. When coaxing Giles down the stairs, defendant hid his knife, denied having a knife and said that he only wanted to talk to him. Then, Giles came down the stairs, passed by defendant and went to Sandrella's room. It was only as Giles began to climb back up the stairs that defendant stabbed him from behind. Such a scenario far more readily admits of a deliberate killing than action under a sudden and intense passion. Sandrella's testimony, moreover, provided no illumination on the question of provocation. When taken by itself, her testimony supported only a finding that defendant did not stab Giles, and when considered in conjunction with other testimony, her testimony could support a theory of self-defense. In either event, it offers no support that defendant acted under provocation or in an unreasonable belief of self-defense.

We therefore hold that the errors defendant complains of were either cured by the trial judge's prompt action or harmless error which do not warrant reversal.

We note, however, that in a significant number of cases, the State on appeal concedes that error has occurred, and raises the harmless error rule as a panacea which precludes reversal despite the acknowledged error. Such a posture on appeal is less persuasive in a case, such as this one, where the error (in this case the questioning of Sandrella as to whether she knew defendant had threatened Sena Allen or whether defendant had threatened Sandrella herself) appears deliberately injected into the trial or is otherwise inexcusable. Were the evidence in this case somewhat closer, or the error further compounded than it was, our resolution of this issue might be different.

We next address the constitutional challenges defendant makes to the Illinois statutory homicide scheme. While defendant's brief argues that "first degree murder" is violative of due process, equal protection, and separation of powers guarantees, in reality it is the second degree murder statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—2) that defendant challenges, based on that statute's shifting the burden of proving mitigating factors to the defendant.

■ Preliminarily, the relevant statutes in Illinois' statutory scheme for homicide shall be discussed. The Criminal Code of 1961 was amended in 1987 and second degree murder replaced voluntary manslaughter. (Pub. Act 84—1450 §2, eff. July 1, 1987 (1986 Ill. Laws

4221, 4233-34).) As the court explained in *People v. Shumpert* (1989), 126 Ill. 2d 344, 351-52, 533 N.E.2d 1106:

> "Under the old homicide statute, the State had the burden to prove, beyond a reasonable doubt, the elements of murder. [Citation.] The defendant then had the opportunity to present evidence of a factor in mitigation, serious provocation or unreasonable belief, either of which must have been present to reduce an offense of murder to voluntary manslaughter. [Citation.] The State then had the burden to prove, beyond a reasonable doubt, the absence of the factor in mitigation. [Citation.] Under the new Act, the State still bears the burden to prove, beyond a reasonable doubt, the elements of first degree murder. [Citation.] However, the defendant now bears the burden to prove, by a preponderance of the evidence, one of the factors in mitigation which must be present to reduce an offense of first degree murder to second degree murder. [Citation.] Thus, the new Act not only requires the defendant to come forward with *some* evidence of a factor in mitigation; it requires the defendant to prove, *by a preponderance of the evidence,* a factor in mitigation." (Emphasis in original.)

In *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319, the Court held that a New York statute which required a defendant, charged with second degree murder, to prove by a preponderance of the evidence an affirmative defense of emotional disturbance, in order to reduce the crime to manslaughter, was not violative of the due process clause of the United States Constitution. (U.S. Const., amend. XIV.) The prosecution was required to prove all the elements of the crime charged, and then the burden shifted to the defendant to prove the affirmative defense. Two other Illinois appellate courts, relying on *Patterson,* have recently held that the Illinois second degree murder statute is not violative of the due process clause. See *People v. Jerome* (1990), 206 Ill. App. 3d 428, 564 N.E.2d 221; *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.

■ Defendant's argument on this issue is essentially that *Patterson* is wrong, and that a prior Supreme Court decision, *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881, should control. However, *Mullaney,* which held that a Maine statute was violative of the due process clause because it required the defendant to prove an element of the crime charged (malice), was specifically distinguished in *Patterson.* (432 U.S at 214-16, 53 L. Ed. 2d at 294-95, 97 S. Ct. at 2329-30.) As the *Buckner* court observed, section 9—2 does not require the defendant to prove any element of the crime of

first degree murder, and does not present the problems found in *Mullaney*, but rather is similar to the statute upheld in *Patterson*. (*Buckner*, 203 Ill. App. 3d at 532.) Thus, sections 9—1 and 9—2 of the Criminal Code are not violative of the due process clause of the United States Constitution.

Defendant also argues that the Illinois homicide scheme violates the equal protection clause of the fourteenth amendment to the United States Constitution. His argument appears to be that the homicide scheme treats murder defendants different than other criminal defendants, in that murder defendants (at least those who can claim that they are guilty of only second degree murder) are discriminated against because they have the burden of proving the mitigating factors. Defendant asserts that the statute affects a fundamental right of his, and thus should be subject to a strict scrutiny analysis.

 Defendant makes no claim that he is a member of a "suspect class." Rather, his argument is that the Constitution provides for his fundamental interest in "just treatment in the criminal process." In support of his argument that the statute(s) should be subjected to strict scrutiny, defendant cites *People v. Kaeding* (1983), 98 Ill. 2d 237, 456 N.E.2d 11. In *Kaeding*, the court observed:

> "When the legislation threatens fundamental constitutional rights or is directed towards a 'suspect' group, then—and only then—courts will examine the statute to insure that it is ' "tailored" narrowly to serve legitimate objectives' [citation] in furtherance of compelling government interests. [Citations.]
>
> *** 'Fundamental interests generally are those that lie at the heart of the relationship between the individual and a republican form of nationally integrated government' [citation], and are rooted in explicit or implicit constitutional guarantees. [Citation.]" (*Kaeding*, 98 Ill. 2d at 245-46.)

The *Kaeding* court, however, also observed that "in keeping with the view of the Supreme Court, [we recognize] a responsibility not to engage in the creation of substantive constitutional rights ' "*** in the name of guaranteeing equal protection of the laws." ' " (98 Ill. 2d at 246, quoting *In re Roger B.* (1981), 84 Ill. 2d 323, 327.) The court further held that the statute challenged in that case (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—6, which permitted a defendant found guilty but mentally ill to be either imprisoned by commitment to the Department of Corrections or placed on probation, periodic imprisonment, or conditional discharge and subject to a course of mental treatment prescribed by the sentencing court), was not violative of the equal protection clause, and that the supervision the defendant sought was not

encompassed in "the fundamental right to fair treatment in the criminal process." *Kaeding*, 98 Ill. 2d at 246.

Similarly, defendant here claims that he did not receive fair treatment in the criminal process. We do not find the claim that the classification should be subjected to strict scrutiny persuasive. As the State points out, section 9—2 of the Criminal Code actually affords criminal defendants charged with murder the opportunity to establish a defense which lessens their punishment that is not provided other criminal defendants. Thus, it is hard to find detrimental discrimination in the scheme. In fact, the *Patterson* opinion observed:

" '[T]he appropriate use of affirmative defenses enlarges the ameliorative aspects of a statutory scheme for the punishment of crime, rather than the other way around—a shift from primitive mechanical classifications based on the bare antisocial act and its consequences, rather than on the nature of the offender and the conditions which produce some degree of excuse for his conduct, the mark of an advanced criminology.' " *Patterson*, 432 U.S. at 211 n.13, 53 L. Ed. 2d at 293 n.13, 97 S. Ct. at 2327 n.13, quoting *Patterson v. New York* (1976), 39 N.Y.2d 288, 305-07, 347 N.E.2d 898, 909-10 (Breitel, C.J., concurring).

Defendant has not argued any constitutional provision from which his alleged right to have the State prove his affirmative defense arises, either explicitly or implicitly. Such a right cannot arise from the due process clause requiring the State to prove defendant guilty of all elements of a crime beyond a reasonable doubt because, as indicated, section 9—2 does not require defendant to prove any element of the crime of first degree murder. Defendant has not cited, nor has our research found, any case law which holds that a criminal defendant is cloaked in a fundamental right requiring the State to prove an affirmative defense of the nature of those in section 9—2. Therefore, we refuse to apply a strict scrutiny analysis to the challenged classification.

■ As a result, defendant's equal protection claim must fail. A statute carries a presumption of rationality when undergoing traditional equal protection analysis. (*Illinois Polygraph Society v. Pellicano* (1980), 83 Ill. 2d 130, 137, 414 N.E.2d 458.) Defendant has proffered no reason why we should hold the Illinois homicide scheme irrational and has not shown (much less argued) that the statutory scheme does not meet a rational basis test, as is defendant's burden. (See *People v. Pembrock* (1976), 62 Ill. 2d 317, 322, 342 N.E.2d 28.) Finally, we note that in the recent case of *People v. Clark* (1991), 207 Ill. App. 3d 439, *appeal denied* (1991), 139 Ill. 2d 599, the Fourth Dis-

trict Appellate Court held that section 9—2 was subject to a rational basis analysis, and that section 9—2 did not violate the equal protection clause. We therefore hold that the statutory scheme is rationally designed to meet a legitimate State purpose, and thus is not violative of the equal protection guarantee.

Defendant's last constitutional argument is that the homicide scheme violates the separation of powers provision of the Illinois Constitution. (Ill. Const. 1970, art. II, §1.) Defendant's premise to this argument is that the new scheme, impermissibly, precludes the State from charging a defendant with second degree murder. The impossibility of such a charge, defendant asserts, flows from the fact that defendant must prove the mitigation which reduces a killing from first degree murder to second degree murder. Hence, the legislature has usurped a power of the State's Attorney, an arm of the executive branch of Illinois government. We disagree.

The State responds that defendant has no standing to assert prosecutors' rights, that a prosecutor may charge a defendant with second degree murder if he chooses, and that even if a prosecutor could not charge a defendant with second degree murder, the homicide scheme is not violative of the separation of powers provision of the Illinois Constitution. Because of the validity of the State's second argument, we need not address the others, and defendant's separation of powers argument, like his due process and equal protection arguments, must fail.

■■■ We are not convinced that a prosecutor in Illinois is precluded from charging a defendant with second degree murder. No language in section 9—2 indicates that a prosecutor may not charge a defendant with second degree murder, and we do not dispute that the State does so when it feels that the evidence will establish second degree murder. In the recent case of *People v. Burks* (1989), 189 Ill. App. 3d 782, 545 N.E.2d 782, the Third District Appellate Court held that the State may charge second degree murder where the State alleges that it can prove the elements of first degree murder but concedes the presence of a mitigating factor included in section 9—2. The court observed that under these circumstances, the defendant would not bear the burden of establishing the mitigating factors, and the jury could be so instructed in the appropriate case. (*Burks*, 189 Ill. App. 3d at 785.) We note, moreover, that section 9—2(c) only requires a defendant to establish mitigation "[w]hen a defendant is on trial for first degree murder." (Ill. Rev. Stat. 1987, ch. 38, 9—2(c).) The statute does not address itself to the situation where the prosecutor charges a defendant with second degree murder. Because defendant's

argument of a separation of powers violation is dependant upon this erroneous premise, it fails.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McNAMARA and EGAN, JJ., concur.