THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RAY ANTHONY HARRIS, Defendant-Appellant.

First District (6th Division)   No. 1—90—2362

Opinion filed March 20, 1992.

Randolph N. Stone, Public Defender, of Chicago (Mark Floyd Pasterski, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, Ray Anthony Harris, was indicted for first degree murder; a jury, after having been instructed on self-defense, first degree murder and second degree murder, found the defendant guilty of first degree murder. He was sentenced to 30 years' imprisonment. The defendant's sole contention is that the instruction on second degree murder coupled with the State's closing argument constituted reversible error.

On February 13, 1989, the defendant, Ray Anthony Harris, shot John Peters to death on the sidewalk in front of Vincent Paxton's house at 511 South Kilbourn in Chicago. According to the deputy medical examiner, Peters was shot in the back, in the knee, in the face, and in the side of the head. Two of the bullets travelled in an upward direction through Peters' body exiting through the top of his skull. The path of the bullets was consistent with Peters being shot while lying on the ground.

Three eyewitnesses, David Love, Anthony Smith and Vincent Paxton, testified for the State. Their collective testimony established the following.

On February 12, 1989, the defendant and John Peters had a fight over a young woman named Brenda Matthews; the defendant bested Peters, who was "all beaten up" and "upset" the next day.

Smith and Paxton were with Peters the next day at Paxton's home when the defendant drove up in his Oldsmobile car. Love was in a vacant lot across the street from Paxton's house. Peters went outside despite the fact that Paxton told him to stay in the house. Paxton and Smith watched from the window of Paxton's house. Peters and the defendant were outside talking, and Smith heard Peters say, "I just want to fight, I don't want no pistol play." Peters began to walk away with his back to the defendant. The defendant pulled out a gun and began firing at Peters. Smith heard three or four shots, then a pause, and then three more shots. The defendant fired shots into Peters while he was lying on the ground. The defendant touched Peters, turned him over and then ran off. None of the three witnesses saw Peters with a gun.

Assistant State's Attorney Mary Moore testified that she took a statement from the defendant which was transcribed by a court reporter at the defendant's request. When the statement was concluded, Moore read it aloud to the defendant, who initialled each page and signed the last page. In that statement the defendant said that he went to Ruby's Tavern at the corner of Harrison and Kilbourn to pick up his brother. His brother had asked him if he had a gun at the house. The defendant did not have a gun, so he brought his friend Ray, who had a gun. Ray's friend "Nuke" also came along. They arrived at Ruby's tavern around 8 or 8:15 p.m. They parked the car, and the defendant exited from the back seat. Peters came running down the street, shouting the defendant's name. The defendant went back to the car and got Ray's gun from the back seat. He held the gun behind his back. Peters said that he wanted to fight again. The defendant said, "If you want to fight again we can fight again." Peters said, "[I]t don't have to be no gun play, we can fight head to head." Peters' hands were in his pockets. The defendant asked Peters if he had a gun, and Peters pulled his hands out of his pockets and opened his palms.

The defendant turned away to give Ray the gun, and Peters turned around with his back toward the defendant and made a motion with his hands in front of his body. The defendant could not see his hands, and he could not tell whether he had a gun. The defendant panicked and started shooting. He shot six times, until the gun was empty. While he was shooting, he was running toward Peters. Peters fell to the ground and was lying on his side. The defendant pulled him over by his left shoulder and put his hand inside Peters' right jacket pocket. He found a gun inside the pocket. He held up the gun and said, "He got a gun. I knew he had a

gun." Nuke hollered, "Come and get in the car." The defendant got in the car, and he was yelling and waving the guns around. Nuke took the guns away from him, and they drove off.

The defendant's testimony varied from his statement. He testified that when he parked his car on Kilbourn and was walking toward Ruby's Tavern, Peters started running down the street, calling the defendant's name. Peters stopped approximately six to eight feet from the defendant and said that he wanted to fight. The defendant told Peters that he would not fight with him. Peters said, "You know, I feel I am a better man than you, I can beat you, but I was drunk last night." The defendant said, "You saw I had been drinking too last night. That was the only reason I fought you last night, but I ain't going to fight you again." Peters walked away, and the defendant went into the tavern. Someone told him that his brother had just left but would be back soon. The defendant went back out to the car and told his friend Ray that he was going to wait for his brother to return. Ray had noticed that Peters had a gun, so he gave the defendant his .38 caliber gun.

Peters fired once at him from the sidewalk in front of 511 South Kilbourn, with a gun he got from Vincent Paxton. The defendant fired back, and Peters fell onto the gate in front of the house. While he was holding onto the gate, Peters shot two more times. Peters fired a total of five shots at the defendant, who was approximately 40 feet away from him.

After the shooting stopped, the defendant walked up to Peters and picked up the .22 caliber gun that was lying on the ground beside him. The defendant took both guns to a location near Division and Laramie and threw them in a garbage can.

The defendant also testified that Assistant State's Attorney Moore handed him a statement that the police said he had written. The defendant told her that he did not write it. Moore asked him to read it, and he told her that he could not read. The last year of school the defendant completed was eighth grade. He could not read the statement, but the "guy in the cell" read it to him. He remembered signing the statement, but he did not read it. An officer told him to sign it so that his mother could come and pick him up. He told Moore that Peters had fired a gun at him. He denied that Nuke, also known as Clarence Walker, was in the car with him and Ray.

Clarence Walker had known the defendant all his life. He had known Peters for two years. He arrived at the area of Harrison and Kilbourn about 8 or 8:30 p.m.; he was there to buy cocaine for

his girlfriend. He saw several persons on a porch. The only one of the persons that he knew was someone named Anthony, who went by the nickname "Ant." Walker saw Peters on the sidewalk, shooting a pistol at the defendant, who was standing about 50 or 60 feet away from Peters.

Walker testified that Ant fired the first shot, then Peters fired, and then Ant fired again. Walker ducked down beside the car, and he heard at least six more shots. He did not realize that the defendant was shooting until he looked up. When he looked up, he saw Peters turn around and "hit the gate." Ant ran away. After about the fifth shot, Peters fell on the sidewalk in front of the house. The defendant walked up to him and stood over him and clicked the pistol. The defendant then left. Walker did not go to the police station. He had previously been convicted for possession of a controlled substance. The identity of Ant was never actually established.

Joseph Szybist, a court reporter who had transcribed the defendant's statement at the police station, testified in rebuttal that the statement was a true and accurate transcription of the conversation that took place between Assistant State's Attorney Moore and the defendant.

The jury was instructed with Illinois Pattern Jury Instructions, Criminal, Nos. 2.03A, 7.05A and 7.06A (2d ed. Supp. 1989) (hereinafter IPI Criminal 2d (Supp. 1989)). The defendant did not object to any of the instructions.

IPI Criminal 2d No. 2.03A (Supp. 1989) provides in part as follows:

> "If the State proves beyond a reasonable doubt that the defendant is guilty of first degree murder, the defendant then has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder, and not guilty of first degree murder. In deciding whether a mitigating factor is present, you should consider all of the evidence bearing on this question. The defendant is not required to present any evidence in order to establish the existence of a mitigating factor."

IPI Criminal 2d No. 7.05A (Supp. 1989) provides that a mitigating factor that could reduce the offense of "first degree murder to the lesser offense of second degree murder" exists if the defendant believes that his use of deadly force was justified but his belief was unreasonable.

IPI Criminal 2d No. 7.06A (Supp. 1989) sets forth the elements of first degree murder which the State must prove. That instruction also provides that the jury may not consider whether the defendant is guilty of the lesser offense of second degree murder until and unless the jury has first determined that the State has proved beyond a reasonable doubt each of the elements of first degree murder. The instruction also repeats that the defendant has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he could be guilty of the lesser offense of second degree murder instead of first degree murder.

During the closing arguments, the assistant State's Attorney said this:

"Defense counsel wants you to believe that the defendant was justified in his actions. That it wasn't first degree murder. But in order to believe that, you have to believe the defendant. *** He wants you to believe [the statement is] not his words. That the conversation he had with the [S]tate's [A]ttorney never took place."

Over a two-hour period during deliberations, the jury requested and received additional instructions. The exchanges and the times they took place are noted as follows:

"JURY (7:25 p.m.): We need further clarification on self-defense and mitigating circumstances for this case. Also clarification regarding second degree murder.

JUDGE (7:40 p.m.): What is it that needs to be clarified?

JURY (7:47 p.m.): Please clear up the fact of John Peters having a gun or not.

JUDGE (7:50 p.m.): You have heard the evidence—you will have to answer this question based upon your collective recollection of the evidence.

JURY (8:20 p.m.): Could we have a more complete understanding of second degree murder?

JUDGE (8:25 p.m.): Specifically what is it you don't understand?

JURY (8:40 p.m.): If we all agree on first degree, how can we arrive at second degree?

JUDGE (9:13 p.m.): If you all agree that the defendant is guilty of first degree murder, then and only then may you consider whether defendant is guilty of second degree murder. You should then decide whether the defendant has proved by a preponderance of the evidence that he is guilty of second degree murder instead of first degree. If however

you all agree that the defendant is not guilty of first degree, your deliberations must end and you should return a verdict of not guilty[.]''

The jury returned a verdict of guilty of first degree murder, and the judge sentenced the defendant to a term of 30 years' imprisonment.

In an abstract sense, we cannot dispute the defendant's contention that the second degree murder instruction is far from crystal clear. The same can be said for the defendant's argument. Indeed, we have considerable difficulty in determining precisely what the defendant's argument is. The heart of his argument in his brief is as follows:

"IPI's 7.05A and 7.06A combined, have an inherent weakness. The court's final instruction and the State's highlighting to the jury that the defense must carry the burden of production as to justification ('to believe that [justification], you have to believe the defendant' ***), enlarged that inherent weakness to the extent that it forced the defendant to carry a burden which is improper under *Reddick*. [*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141.]

Where, as here, the State presented no evidence as to justification, the defense is, indeed, required to present 'some evidence thereon.' *** Ill. Rev. Stat. 1987, ch. 38, §3—2(a). Yet, the defendant was then required to carry the burden of proof that that same belief was unreasonable. IPI 2.03A does not cure the situation, it just confuses the jury by informing them that the defense can prove the condition that the belief was unreasonable without presenting any evidence—this being after the defense just presented evidence disproving that same condition.''

The defendant concedes that the statute upon which the instruction was based is constitutional. (See *People v. Lyons* (1991), 213 Ill. App. 3d 617, 572 N.E.2d 1163; *People v. Gore* (1991), 212 Ill. App. 3d 984, 571 N.E.2d 1041.) He also concedes that the instructions were proper and that the State's argument was proper. He finds no fault with the answers the judge made to the jury's questions (nor did he at the time they were made), and he provides us with no solution to the problem, whatever it may be.

■ At the outset we agree that the defendant has waived any argument by failing to object to the jury instructions made before and after deliberation began or to the prosecutor's remarks and by failing to proffer any alternative jury instructions and by failing to

raise the issue in his post-trial motion. (*People v. Britz* (1988), 123 Ill. 2d 446, 528 N.E.2d 703.) We also believe that the plain error doctrine is not applicable here. That doctrine is applied where the evidence of the defendant's guilt is closely balanced or where the error denied the defendant a fair trial. (*People v. Shields* (1991), 143 Ill. 2d 435, 575 N.E.2d 538.) The evidence in this case was not closely balanced; the State's case was a strong one. Three eyewitnesses testified that the victim was unarmed. Only the defendant and Clarence Walker testified that the victim had a gun, which was never found, and their testimony conflicted widely on material issues, such as who fired the first shot. Indeed, their versions of the events are irreconcilable. The defendant made no mention of Ant. The defendant was not wounded, and Peters was shot in the back. Some of the gunshot wounds were sustained while the victim was lying down. The defendant made a very damaging statement. Consequently, we conclude beyond a reasonable doubt that, *if* any error occurred, the instructions and argument by the State did not improperly affect the jury's deliberation.

■ Waiver aside, we do not find that any error occurred. We interpret the defendant's argument to be based on his allegation that the State's Attorney told the jury that "defense must carry the burden of production," that is, the burden of going forward with evidence, in order to justify a finding that the defendant acted in self-defense. The defendant's allegation is not only inconsistent with his statement that the argument was proper, it is also factually incorrect. The State's Attorney told the jury, not that the defendant had the burden of production of evidence, but simply that the jury could not find the defendant not guilty based on justification unless it believed the defendant's testimony. This was a clearly proper argument that dealt with credibility only and not with any burden of proof.

■ Although a misstatement of the defendant in his brief is not controlling in our decision, we deem it appropriate to correct it. The defendant maintained that the "State presented no evidence as to justification" and that, therefore, the defendant was required to present " 'some evidence thereon.' " That statement is based on speculation and is an assumption we are not willing to accept. A trial judge is justified in giving a self-defense instruction if there is slight evidence to support it, regardless of its source and even if the evidence upon which the judge relies is contrary to the defendant's own testimony. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 394 N.E.2d 31; *People v. Robinson* (1987), 163 Ill. App. 3d 754, 516

N.E.2d 1292.) In the statement made to Assistant State's Attorney Moore, the defendant said that Peters turned with his back toward the defendant and made a motion with his hands in front of his body. He could not tell whether Peters had a weapon. After he found a gun inside Peters' pocket, he said, "I knew he had a gun." We cannot say with certainty that the trial judge would not have deemed that statement of the defendant to Moore to be the "slight evidence" that would justify giving a self-defense instruction. By these observations, we do not mean to imply that the judge would have been required to give a self-defense instruction based on the defendant's statement to the assistant State's Attorney.

■ The only case cited by the defendant is *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141. In *Reddick*, the court noted that the murder instruction placed upon the State the burden to prove that the defendant did not have a reasonable belief of justification; however, the voluntary manslaughter instruction required the State to prove that the defendant did have an unreasonable belief of justification. The court said, "These instructions essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter." (123 Ill. 2d at 194-95.) In this case, the only burden of proof placed on the defendant was to prove by a preponderance of the evidence that he had an unreasonable belief of justification.

*Reddick* indicates that a court should examine the entire record in determining whether the jury was properly instructed. (*People v. Shields* (1991), 143 Ill. 2d 435, 445, 575 N.E.2d 538, 543, citing *Reddick*, 123 Ill. 2d at 198.) The entire record shows that the jury was instructed that the State had the burden of proving guilt beyond a reasonable doubt and that the defendant was not required to present any evidence in order to establish the existence of a mitigating factor. They were properly instructed on the elements of first degree murder, circumstances justifying a killing, and the mitigating factor which would reduce the charge against the defendant to second degree murder. The IPI instructions accurately stated the applicable law; consequently, the trial judge was required to use them. (134 Ill. 2d R. 451.) Moreover, in *Reddick*, it was not merely the confusing nature of the instructions which required a new trial, but also the fact that the jury was never apprised of the correct burden of proof. *People v. Kolichman* (1991), 218 Ill. App. 3d 132, 145, 578 N.E.2d 569, 578, citing *Reddick*, 123 Ill. 2d at 198-99.

Last, even if *Reddick* were applicable to this case, we repeat that any error may be deemed harmless if the jury's verdict would

have been the same if it had been instructed properly. (*People v. Mackey* (1990), 207 Ill. App. 3d 839, 566 N.E.2d 449.) Considering the quantum of the State's evidence, we conclude that the jury's verdict would have been the same.

The judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.