(No. 62975.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TERRANCE SAWYER, Appellant.

*Opinion filed December 19, 1986.—Rehearing denied January 30, 1987.*

186

SIMON, J., concurring in part and dissenting in part.

Robert Agostinelli, Deputy Defender, and Gary R. Peterson, Assistant Defender, both of Ottawa, and Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport, Assistant Defender, both of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Mark L. Rotert and Joan G. Fickinger, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

The defendant, Terrance Sawyer, was convicted by a McDonough County jury of voluntary manslaughter for the stabbing death of Garry Kennedy. The trial court, however, found that it had improperly refused to give the defendant's tendered instruction on the use of force in defense of a dwelling (Illinois Pattern Jury Instruction, Criminal, No. 24—25.07 (2d ed. 1981)), and granted the defendant's motion for a new trial. At the retrial, a second jury convicted the defendant of voluntary manslaughter. The trial court sentenced the defendant to the minimum term of four years' imprisonment. The appellate court affirmed (139 Ill. App. 3d 383). We allowed the defendant's petition for leave to appeal (87 Ill. 2d R. 315).

The only issue raised is whether the State proved beyond a reasonable doubt that the defendant was not justified in using deadly force in the defense of a dwelling.

The defendant and Kennedy had been acquainted for eight or nine years. They attended the same high school and had played basketball together. The defendant met Belinda Stevens while the two were students at Western Illinois University in Macomb. They started dating, and Stevens later gave birth to his child. After the child was born, the defendant, Stevens and their child lived together in Macomb. When the couple began having difficulties in their relationship, Stevens and the child moved to another apartment. Several months after she stopped living with the defendant, Stevens began dating Kennedy on occasion. While she was dating Kennedy, however, she continued to see the defendant from time to time. The defendant graduated from Western and moved back to his home in Chicago. Stevens and her child spent the summer of 1983 in Chicago. She and Kennedy continued to see one another throughout the summer and began dating steadily. Stevens returned to Macomb with

her child to begin the fall semester in August 1983. She and Kennedy saw one another every day.

On September 18, 1983, the defendant drove from Chicago to Stevens' residence in Macomb. He was staying with Stevens on September 20, 1983, when, at approximately 10 p.m., Kennedy arrived. The defendant answered the door and let him inside, whereupon Kennedy, Stevens and the defendant briefly discussed their relationship. When Kennedy asked Stevens to choose between the defendant and himself, Stevens chose the defendant. At this point, the defendant said that he was going to leave and walked out of the house. Stevens followed the defendant outside to his car. The defendant asked Stevens to return to Chicago with him. When she refused, he said he was going to take their child back to Chicago. The defendant then returned to the house and went into Stevens' bedroom to pack for his trip back to Chicago. Stevens then followed the defendant into her bedroom.

By this time, one of Stevens' roommates, Cheryl Sherman, woke up and was sitting on the couch in the living room. Kennedy sat with Sherman and the two talked for about five minutes. Sherman testified that it did not appear that Kennedy had been drinking. When Stevens came back into the living room, Sherman went into Stevens' bedroom, where the defendant was packing his bags.

While Sherman and the defendant were in the bedroom, Stevens and Kennedy talked in the living room. Kennedy asked Stevens why she chose the defendant. When Stevens explained that she did so because he could provide for her and her child, Kennedy slapped her. Kennedy then apologized and Stevens asked him to leave. As they approached the front door, Kennedy turned to Stevens, said, "You b----," and hit her again.

The defendant and Sherman heard Kennedy slap

Stevens and came out of the bedroom. The defendant looked down the hallway toward the front door where he saw Stevens lying on the floor. According to Sherman, the defendant said "What the f---" or "What the f--- [is] going on here." The defendant then walked quickly to the kitchen and grabbed a knife. By the time the defendant returned to the hallway, Kennedy had already left the house. The defendant put the knife on a desk in the hallway near the front door and followed Kennedy outside.

The two men walked to the front lawn. Sherman testified that she stood in the doorway, and saw the two men talk for four or five minutes. She could not, however, understand their conversation because they were "mumbling." Stevens also testified that while the defendant and Kennedy stood outside, they were "talking." Stevens further testified that when Kennedy saw her standing in the front door, he asked her "what the f--- [she] was doing." The defendant turned around and walked toward the house, and Kennedy followed. According to Sherman's testimony, neither man swung at the other and both men appeared to be "pretty calm" as they walked back toward the house. The defendant entered the house first. As Kennedy approached the door, Stevens told him not to come inside. Stevens testified that Kennedy responded, "Why, Lynn, I have been coming in here." Kennedy then opened the screen door. Nobody attempted to prevent him from opening the door. He then stepped inside the door and stood approximately an arm's length from the defendant. Stevens testified that after Kennedy was inside, he "just stood there," and did not strike her. Sherman also testified that Kennedy did not attack anybody when he stepped into the doorway. At this point, a scuffle ensued, but it is not clear who started the scuffle. At some point during the struggle, the defendant reached behind his back and found the knife. The two men fell through the door. Kennedy fell backwards onto the concrete walkway

leading to the front porch and the defendant landed on top of him. When the defendant stood up, Kennedy was bleeding from a stab wound to his chest. Kennedy died from the wound a short time later.

Shortly thereafter, Stevens flagged down a passing Macomb police car. Officer Leo Icenogle saw the defendant standing near the corner of the house with blood on his shoes and jacket. He approached the defendant and asked him to identify himself. The defendant waived his *Miranda* rights and told Officer Icenogle that Kennedy had slapped Belinda Stevens. He also stated that he had placed the knife near the front door because he was afraid of Kennedy and feared that he would return to the house to cause trouble. The defendant also told Officer Icenogle that when Kennedy came back into the house he tried to push past the defendant to slap one of the young ladies who lived there. He admitted stabbing Kennedy during the ensuing scuffle, telling Officer Icenogle, "I'm the one that stabbed the dude."

Several hours after he was taken into custody, the defendant gave a statement to Detective Robert Canavit. The defendant told Detective Canavit that after Kennedy left the house he went outside and saw Kennedy leave the area. The defendant said he then went back inside to assist Stevens and locked the doors. He said that after he had secured the doors he did not know what else he could do because there was no telephone in the house. The defendant said he then placed the knife on the desk near the front door. He told Detective Canavit that he knew Kennedy had struck a young lady in the head with a drafting board while he was in high school. He also told Detective Canavit that Kennedy had been involved in fights in college, had been known to carry a gun, and had displayed a gun during a fight on one occasion. The defendant further stated that after he secured the house he went outside to start his car when Kennedy returned.

According to the defendant's statement, Kennedy grabbed him by the shirt and said, "No, I'm not going to hurt you" and released him. Kennedy then grabbed the defendant a second time and said, "No, I'm not going to hurt you, but I should." The defendant told Detective Canavit that things had calmed down considerably by this time. When Kennedy saw Stevens standing in the door, however, he asked her what she was looking at and started toward the house. The defendant said that when Stevens asked Kennedy not to enter the house, Kennedy replied, "You can't stop me," and entered the house. The defendant claimed that Kennedy pushed past Stevens and grabbed him. During the ensuing struggle, the defendant said he reached behind himself and found the knife he had placed on the desk earlier. He told Detective Canavit that he closed his eyes and struck out, stabbing Kennedy. The defendant further stated that after he had stabbed Kennedy, he panicked.

At trial, he relied upon the affirmative defense of justified use of force in the defense of a dwelling. The defendant did not take the stand in his defense, and nearly all of the evidence was introduced through the State's witnesses. The jury found the defendant guilty of voluntary manslaughter. The defendant was sentenced to the minimum term of four years' imprisonment. The appellate court concluded that Kennedy's entry into the house was not riotous, violent or tumultuous and held that the State disproved the defendant's affirmative defense beyond a reasonable doubt. 139 Ill. App. 3d 383, 386.

The defendant contends that he was not proved guilty beyond a reasonable doubt. Section 9—2(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(b)) provides:

> "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that,

if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

Defendant contends that he reasonably believed that he was justified in using deadly force in defense of a dwelling. Section 7—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 7—2(a)) provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(a) The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling ***."

Thus, the use of deadly force in defense of a dwelling is justified only when two factors are present. First, the victim's entry must be made in a "violent, riotous, or tumultuous manner." Second, the defendant's subjective belief that deadly force is necessary to prevent an assault upon, or an offer of personal violence to, him or another in the dwelling must be reasonable. The defendant argues that both of these factors were present in his case.

Defendant first contends that Kennedy's reentry into the house was violent, riotous and tumultuous. To support this argument, he notes that Kennedy had slapped Stevens twice before he reentered the house, shouted profanity at her and ignored her request not to reenter the house. On the other hand, the record shows that although Kennedy had slapped Stevens twice, the defendant knew only that Kennedy had slapped her once. Sherman testified that she did not see either man swing at the other and that both men appeared to be "pretty

calm" as they walked back toward the house. She further testified that there was no struggle as Kennedy and the defendant came through the door. Several hours after the stabbing, the defendant told Detective Canavit that when Stevens asked Kennedy not to come into the house, Kennedy replied, "You can't stop me." Stevens, however, testified: "After [defendant] came in I sort of stood, came to the door. I said, 'Garry, don't come in.' And he said, 'Why, Lynn, I have been coming in here.'" Stevens further testified that she did not brace the door. Instead, she let it yield when Kennedy entered. Nobody else tried to keep Kennedy from opening the door. The evidence presented clearly established that Kennedy's reentry into Stevens' house was unlawful. We do not, however, believe that Kennedy entered in a "violent, riotous or tumultuous manner." The record shows that Kennedy simply opened the screen door and stepped inside the house.

Defendant also contends that he reasonably believed that deadly force was necessary to prevent an assault by Kennedy upon Stevens. In the context of self-defense, it is the defendant's perception of the danger, and not the actual danger, which is dispositive. (*People v. Johnson* (1954), 2 Ill. 2d 165, 171.) Defense of dwelling differs from self-defense in that, unlike self-defense, defense of a dwelling "does not require danger to life or great bodily harm in order to invoke the right to kill." (*People v. Eatman* (1950), 405 Ill. 491, 497.) Nevertheless, as in cases of self-defense, the issue in defense of a dwelling is whether the facts and circumstances induced a reasonable belief that the threatened danger, whether real or apparent, existed. The reasonableness of a defendant's subjective belief that he was justified in using deadly force is a question of fact for the jury to determine. (*People v. Evans* (1981), 87 Ill. 2d 77, 86; *People v. Lockett* (1980), 82 Ill. 2d 546, 552.) This court will not

disturb a jury verdict " 'unless the evidence is palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory that it justifies entertaining a reasonable doubt of the defendant's guilt.' (*People v. Jordan* (1960), 18 Ill. 2d 489, 492-93.)" *People v. Evans* (1981), 87 Ill. 2d 77, 86.

The defendant argues that he reasonably believed that Kennedy was about to assault Stevens when he entered the house. In support of this argument, he claims that the evidence showed that Kennedy attempted to strike Belinda Stevens after he reentered the house. He claims the record shows that Kennedy was the aggressor throughout the incident, was intoxicated, and had a history of violence which was known to the defendant. The record, however, fails to support the reasonableness of defendant's fear.

After his arrest, the defendant told Detective Canavit that when Kennedy reentered the house he pushed past Stevens and grabbed the defendant by his shirt. Stevens, however, testified that after Kennedy stepped inside he "just stood there" and did not strike her. Sherman's testimony corroborates Stevens'. Sherman testified that after Kennedy entered the house, the two men stood at the doorway, arm's length apart, and talked. According to Sherman, Kennedy did not strike her, Stevens, or the child. She also testified that she did not know who the aggressor was.

Although the autopsy results indicated that Kennedy's blood alcohol level was .135, Sherman, who sat on the couch and talked with Kennedy for five minutes, testified that it did not appear to her that he had been drinking at all. While defendant contends that he feared Kennedy because he knew Kennedy to have carried a gun, this fear did not prevent the defendant from letting Kennedy inside the house when he answered the door. Nor did it prevent him from following Kennedy outside

the house after he had slapped Stevens. When the defendant gave his statement to Officer Icenogle at the scene immediately after the stabbing, he did not mention his purported knowledge that Kennedy was known to have carried a gun. In fact, the defendant did not tell anybody that he knew Kennedy to have carried a gun until his interview with Detective Canavit several hours after the stabbing. Moreover, he did not express any fear that Kennedy was armed. Finally, the defendant admitted, during his interview with Detective Canavit, that he did not panic until *after* he had stabbed Kennedy. We believe the jury could have properly concluded, from this evidence, that the defendant could not have reasonably believed that Kennedy was about to assault or offer personal violence to himself or anybody else in the house.

The State contends that, even if the defendant reasonably believed that Kennedy was about to assault or offer personal violence to either himself or anybody else in the house, he could not have reasonably believed that deadly force was necessary to prevent such an assault or offer of violence. Defendant relies upon this court's decision in *People v. Givens* (1962), 26 Ill. 2d 371, to support his contention that the killing was justified.

The defendant in *Givens* was returning to his boarding-house room when he observed a stranger arguing and scuffling with another resident. The stranger followed the defendant to his room, stood in the doorway, and prevented him from closing his door. The defendant did not know the man. When the stranger approached the defendant with his hands in his pockets, the defendant warned him not to enter and stated that he could not fight the man. When he continued to advance upon the defendant, the defendant shot and killed him. This court reversed the defendant's murder conviction, holding that the killing was justified in defense of the defendant's habitation. The defendant argues that his

case is even more compelling than *Givens* because he did not resort to deadly force until after a hand-to-hand struggle. Although this case is similar to *Givens* in that the defendant was resisting an unlawful entry by an individual who ignored a command to stay out, the similarities end there. We find the defendant's reliance upon *Givens* is misplaced.

The defendant in *Givens* was 59 years old, stood 5 feet 9 inches tall, weighed 130 pounds, and was nearly blind. He had lost one eye in a beating two years earlier. The deceased, on the other hand, was described as a "well developed 35-year-old [man] weighing about 170 pounds." (*People v. Givens* (1962), 26 Ill. 2d 371, 372-73.) On those facts, this court found that, "[s]ince defendant was in no way physically able to repel the intruder by hand combat, his belief that shooting was the only way to protect himself and to stop decedent was, under the circumstances, not unreasonable." (26 Ill. 2d 371, 376.) Here, unlike the defendant and victim in *Givens*, the defendant and Kennedy were approximately the same age and physical size. In addition, unlike the defendant and victim in *Givens*, the defendant and Kennedy had known one another for eight or nine years. Before coming to Western Illinois University, they attended the same high school and had played basketball together. Given these factual distinctions, *Givens* does not support the defendant's argument in this case.

We agree with the appellate court's conclusion that Kennedy's entry into the house was not riotous, violent or tumultuous. Our review of the record indicates that there was sufficient evidence for the jury to reject the defendant's claim that he reasonably believed that he was justified in using deadly force in defense of a dwelling. We believe, from the evidence presented, the jury could have properly concluded that the defendant's belief that Kennedy was about to commit an assault was un-

reasonable. Moreover, even if the jury found that the defendant reasonably believed that Kennedy was about to commit an assault, it could have properly found that the defendant's belief that the stabbing was necessary to prevent such an assault was unreasonable. Consequently, the evidence proved the defendant guilty of voluntary manslaughter beyond a reasonable doubt. We find nothing so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's guilt.

For the reasons stated herein, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part:

I agree with the majority's conclusion that the defendant was proved guilty of voluntary manslaughter, although not with all of the analysis in the majority opinion. I dissent only from affirmance of the defendant's sentence to a term of four years' imprisonment.

Although in the appellate court the defendant attacked his sentence, he failed to raise the issue in this court, and normally that would conclude the matter. After having reviewed the record here, however, it appears to me that the failure of the trial judge properly to assess the factors in mitigation and aggravation in imposing sentence was so pronounced that the interests of justice require our *sua sponte* consideration of the sentence. This court has previously held that a reviewing court cannot reduce a sentence of imprisonment to one of probation (*People v. Rege* (1976), 64 Ill. 2d 473, 482), a principle with which I do not necessarily agree. At a minimum, however, it is an abuse of discretion for a judge to impose a prison sentence instead of granting probation when this appears to be the result of an improper evalu-

ation of the factors which should be considered. In that event it is the responsibility of the reviewing court to intervene. I would therefore vacate the sentence imposed and remand with directions to reconsider the appropriateness of probation under the proper statutory standards.

According to the uncontroverted evidence elicited in mitigation at the sentencing hearing, Terrance Sawyer has a background and record the like of which is not often seen in a criminal courtroom. He graduated from a Chicago high school where he was captain of the basketball team, homecoming king, and most popular senior. He attended Lewis University and then Western Illinois University, from which he graduated in May 1983. At the time of sentencing he worked as a full-time substitute teacher in the Chicago public schools and was also a graduate student at the University of Illinois, Chicago Circle campus. He has been active in his church and in volunteer community activities. He has no prior record of criminal or delinquent behavior.

At sentencing, eight witnesses testified in his behalf, including two faculty members from Lewis University, Belinda Stevens' mother, and the associate minister of his church. He was described as a "very fine young man," a "positive, helpful, friendly, serious man," and a good father. In addition, more than 20 letters—from the assistant principal of his high school, the minister of his church, a college professor and others—attesting to Mr. Sawyer's good character were admitted into evidence.

Despite this evidence, and despite the evidence at trial concerning the circumstances of the offense, the trial judge found only one factor in mitigation, the absence of any prior record of criminal activity or delinquency. In so holding, the judge rejected a number of other mitigating factors which should have been considered.

Most importantly, the judge refused to consider in mitigation that "there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.1(a)(4).) Although Sawyer's belief in the necessity of using deadly force was objectively unreasonable, the circumstances certainly *tended* to justify his conduct. The deceased, who was intoxicated, had twice slapped Belinda Stevens (once hard enough to knock her down), had directed profanities at her, and had reentered the house against her will. Neither Stevens nor her roommate, Cheryl Sherman, contradicted the account the defendant gave to the police—which two police officers repeated at trial—that the deceased was the aggressor in the "scuffle" which ended in his death. Belinda Stevens also testified that their small child was clinging to Sawyer's leg when the deceased reentered the house moments before the scuffle. While this evidence did not establish an acceptable defense, it certainly furnished substantial grounds tending to explain and excuse the defendant's reaction. It is also relevant to two other statutory mitigating factors: that the defendant acted under a strong provocation and that his conduct was induced by someone else, namely, the deceased. Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.1(a)(3), (a)(5).

The legislature has also provided that a trial judge shall consider in mitigation the fact that "the defendant's criminal conduct was the result of circumstances unlikely to recur." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.1(a)(8).) If this factor is to have any meaning, it must mitigate an offense precipitated by a rival suitor who is intoxicated, who has struck an occupant of the house twice, who enters the house without authorization, and who poses at least an indirect threat to everyone in the house, including the defendant's 18-month-old child.

The strong evidence of the defendant's otherwise stainless background also tends to show that his "character and attitudes *** indicate that he is unlikely to commit another crime." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.1(a)(9).) Finally, each of the witnesses who testified in mitigation expressed certainty that the defendant would be able to comply with the terms of probation. Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.1(a)(10).

The appellate court stated that while the trial judge may not have "recited" each mitigating factor (139 Ill. App. 3d 383, 387), it is presumed that he considered all the evidence before him. The mere fact that the trial judge heard the evidence, however, does not mean that he properly applied the law to that evidence and actually considered it as mitigating. It is quite clear from the record here that the trial judge thought the only factor properly counted in mitigation was the defendant's lack of a prior criminal record. Although defense counsel argued a number of other factors as well, the judge specifically found only that factor in mitigation. On the sentencing order signed by the trial judge, each of the statutory factors in mitigation is crossed out with the exception of the absence of a criminal record.

The only factor the trial judge found weighing on the other side of the balance was the necessity of deterring others from committing the same crime. The defendant was convicted, though, of making an unreasonable judgment as to whether the use of deadly force was justified; this appears to me to be the type of offense for which punishment can have very little, if any, deterrent effect on other potential offenders. When called upon to respond to an imminent threat of physical violence, it is unlikely that the average person will have the time or ability to figure out the implications of this court's decisions. Whatever the criminal law can do, improving the split-second judgment of citizens faced with stressful and

rapidly developing circumstances is not one of them.

By ignoring a significant number of factors in mitigation, and improperly considering a supposed factor in aggravation, the trial judge abused his sentencing discretion. That abuse has resulted here in a miscarriage of justice. I therefore dissent.