THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY MANLEY, Defendant-Appellant.

First District (6th Division)   No. 1—89—0499

Opinion filed December 13, 1991.

Randolph N. Stone, Public Defender, of Chicago (Lester Finkle, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Carol L. Gaines, and Pamela Paziotopoulous, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:
Defendant, Timothy Manley, was charged by indictment with two counts of murder and with one count of armed violence. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2), 33A—2.) Following a jury trial, defendant was convicted of one count of murder, and was sentenced to a term of 40 years. On appeal, defendant contends that (1) he was deprived of the right to due process by the the prosecutor's improper reference to defendant's post-arrest silence; (2) he was deprived of the right to a fair trial by improper comments made by the

prosecutor during opening statements and closing argument; (3) the trial court erred in failing to instruct the jury that an attorney has the right to interview a witness; (4) he was not proven guilty of murder beyond a reasonable doubt; and (5) the statute under which he was convicted is violative of the Illinois and the United States constitutions.

The evidence presented to the jury established that on September 27, 1987, defendant and the victim, James Conwell, engaged in a physical altercation which ultimately resulted in Conwell's death caused by multiple stab wounds to various parts of his body.

At trial, Dennis Ware testified that he lived at 6110 South Eberhart in Chicago, Illinois. Ware stated that this was a three-flat building and that he and his wife, Ann, lived on the second floor. The apartment on the third floor was occupied by Ware's sister, Lottie Conwell, and her husband, James Conwell, the victim. Lottie and James Conwell had been married for 17 years in 1987 and both worked for the Wilfred Beauty Academy. In September 1987, Lottie Conwell was transferred by her employer from Chicago to Houston, Texas. Prior to the 27th of September, Lottie moved to Houston, and Conwell was to follow her shortly.

Ware testified that he was at home during the evening of September 26, 1987, and at 8 p.m., he saw Conwell, who was on his way to church. Ware and his wife hosted a jewelry demonstration in their home that night, and they went to sleep sometime after their guests left at 12 midnight. At approximately 3:15 a.m. on the 27th, Ware was awakened by a loud rumbling noise coming from the apartment upstairs. The noise became increasingly louder, and Ware went upstairs to Conwell's apartment after he told his wife to call the police. As he stood outside the door to Conwell's apartment, Ware heard Conwell holler, "Dennis, Dennis, help me, help me." Ware knocked and told Conwell to open the door. Conwell continued to call out for help. Ware then heard another male voice say, "okay, motherfucker, okay motherfucker." Ware was unable to enter the apartment because the door was locked. After two to three minutes, Conwell stopped hollering, and Ware went downstairs to find a key to Conwell's apartment.

Ware and his stepson then went up the rear staircase to the back door of Conwell's apartment. Upon looking through the back door window into the apartment, Ware saw Conwell's legs draped across a stereo cabinet. Ware and his stepson were unable to enter the apartment through the back door because it was locked. They then went around to the front of the building and used a key to enter Conwell's

apartment through the front door. Inside the apartment, Ware observed that the apartment was in disarray with furniture overturned and strewn about. Ware also saw Conwell's body lying across the stereo cabinet. Police officers and paramedics arrived shortly afterward, and Ware led them to Conwell's apartment. The following day, Ware observed bloodstains and a finger mark on a window pane in Conwell's apartment.

Ware testified that he had known Conwell for 17 years and had suspected that Conwell was either homosexual or bisexual. Ware stated further that he had not known Conwell to be a violent person.

Ann Ware's testimony corroborated that of her husband as to the events occurring on September 26 and 27.

Chicago police officer Keith Calloway testified that at approximately 3:35 a.m. on September 27, 1987, he and his partner responded to a radio transmission reporting a domestic disturbance at 6110 South Eberhart. Upon entering the third-floor apartment at that address, Calloway observed a male body lying on its back over a stereo cabinet. Calloway secured the scene and called his supervisors. Shortly thereafter, the detectives and paramedics arrived. After checking for vital signs, the paramedics pronounced Conwell dead.

Calloway saw bloodstains throughout the apartment. He also observed that there were no signs of forced entry and that nothing appeared to be stolen. Although Calloway searched the entire apartment, he was unable to locate the murder weapon.

Chicago police detective Dennis Dwyer testified that he arrived at the scene shortly after 4 a.m. on September 27, 1987. Upon examining Conwell's body, Dwyer noticed that both arms were outstretched and that there was a gas bill in Conwell's left hand and a telephone in his right hand. Dwyer observed that the apartment was in disarray and that there was a lot of blood in the dining room and in the television room. The south wall of the apartment contained three windows, one of which was open. Dwyer observed blood on the frame and sill of the open window. He also saw bloody footprints in the gangway below the window. The footprints led out of the gangway and then north along the sidewalk.

Officer Frank De Marco testified that he was a lab technician and that he went to the scene at about 4:10 a.m. on September 27, 1987. De Marco observed a body in the dining room, but he was unable to find a murder weapon. De Marco testified further that he observed a fingerprint in blood on a window frame in the dining room. De Marco photographed the apartment, including the window sill and frame, and focused upon the fingerprint impression left on the window

frame. De Marco affixed an identification tag onto the window frame and took the frame to the crime lab.

Officer William Kovacs testified that he was a latent fingerprint examiner for the Chicago police department. Kovacs explained the basic elements and factors in fingerprint identification. Kovacs also described the Automated Fingerprint Identification System (AFIS), which is a computerized data base with 800,000 fingerprints stored in its memory. On October 13, 1987, Kovacs processed through AFIS an image of the fingerprint found at Conwell's apartment. AFIS identified a print of defendant, numbered 635212, as a potential or likely match to the print found at Conwell's apartment. After personally comparing the two prints, Kovacs found 23 points of similarity, found no unexplained dissimilarities, and concluded that both prints belonged to the same person. Kovacs stated that these points of similarity are conclusive as to the identification of a latent print and the defendant's print on the AFIS card matched the print found at the scene.

Detective Gerald Liberty testified that sometime after October 13, 1987, he retrieved through AFIS the defendant's name and the address of 4728 South Ingleside. When Liberty went to defendant's apartment, he discovered that the apartment had been abandoned. Liberty subsequently spoke with defendant's brother, Tony Manley, who indicated that defendant was in Mariana, Arkansas, with their mother.

Liberty testified further that he procured a warrant for defendant's arrest for first degree murder, and on November 5, 1987, he and Detective Dwyer travelled to Mariana, Arkansas, to arrest defendant. The officers picked defendant up from the jailhouse in Mariana and brought him back to Chicago. Defendant had casts on both of his legs and was in a wheelchair.

Liberty also stated that prior to the retrieval of Manley's name through AFIS, the police investigation focused on possible male lovers of Conwell because some witnesses initially suggested that Conwell was homosexual.

Dr. Tom Reinsel testified that on September 29, 1987, he was working at Cook County Hospital and treated a patient identified as "Tim P. Baffield," who had sustained fractures in his left leg and in his right heel and had been brought in from the University of Chicago Hospital. The patient gave his address as 4728 South Ingleside and stated that his social security number was 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.

Reinsel stated that the patient had surgery on his left leg and casts were put on both legs. Aside from the injuries to his legs, the

patient suffered from no other injuries and had no other complaints. He had no cuts, lacerations, stab wounds, or bruises. The patient told the hospital staff that he sustained his injuries in a fall down a flight of stairs. Reinsel testified that the patient's injuries were not consistent with those to be expected from a fall down stairs. Reinsel testified that the patient's injuries were consistent with those to be expected from a fall from a third-floor window, landing feet first on a concrete sidewalk. The patient stayed in the hospital until October 7, 1987.

Paul Razor testified that he was a supervisor at Cermak Health Services and that he processed defendant when he was brought to the Cook County jail on November 7, 1987. Defendant gave his address as 4728 South Ingleside and stated that his social security number was 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. Razor specifically recalled processing the defendant because he had casts on both of his legs.

Robert Kuhlmann, supervisor of the emergency medical technician department at Cermak Health Services, testified that he spoke with defendant on November 17, 1987, and that defendant stated that he sustained his injuries by jumping from a third-story window.

Leon Malone testified that he had been friends with Conwell. Malone stated that he and Conwell had attended church together in the evening of September 26, 1987, and that he had driven Conwell home after church. Malone testified that Conwell was not violent, but was always calm and collected. Malone stated that he never saw Conwell use drugs and he never suspected Conwell of being homosexual.

Glenn Gibson testified that on the date of Conwell's death, he had been employed as an investigator for the medical examiner's office. Gibson testified that Ware told him that Conwell was a hairdresser and was homosexual. Ware also stated that he believed Conwell's death related to this fact and that the offender was in Conwell's apartment for this purpose.

Dr. Robert Kirschner testified that in September 1987 he was employed as a forensic pathologist and performed an autopsy on the body of James Conwell. Kirschner stated that Conwell's clothing was heavily stained with blood and that he had suffered a total of 28 stab wounds to various parts of his body, primarily on the back of the head, back of the neck, and on the hands and legs. Conwell sustained a large, gaping stab wound in the left shoulder region and a smaller wound in the mid-line of the upper portion of the back.

Kirschner testified that the wounds on Conwell's hands, arms, and legs were consistent with defense wounds which are sustained when a person attempts to ward off a weapon. Kirschner also indicated that Conwell's wounds were similar to those that could be in-

flicted on someone who had been stabbed while wrestling with another person.

Kirschner determined that the cause of Conwell's death was extensive bleeding as a result of multiple stab wounds and that there was no single fatal injury or stab wound which pierced any internal organs.

Defendant testified that in the early morning hours of September 27, 1987, he was walking home from a friend's house when he met Conwell, who indicated that he needed a dollar in order to buy some alcohol. Defendant gave Conwell a dollar, and Conwell bought one-half pint of Seagram's gin. Conwell then offered defendant a drink.

Conwell introduced himself as "Mike" and invited defendant to his apartment, saying that he had some marijuana and would invite some women over. Defendant initially refused to enter Conwell's apartment, but eventually agreed and went to the third-floor apartment at 6110 South Eberhart. Conwell asked defendant to be quiet so they would not disturb other members of Conwell's family who also lived in the building.

Defendant testified that once inside the apartment, Conwell admired defendant's ring and watch and then rubbed defendant's palm and thigh. Defendant pushed Conwell away, indicating that he was not interested in engaging in homosexual behavior, and stated that he wanted to leave the apartment. Conwell told defendant to wait while he got some marijuana from another room. When Conwell returned, however, he was holding a large butcher knife and said to defendant, "[m]otherfucker, you are going to give me that ring or anything I ask you for. You are going to give it to me."

Defendant testified that he was scared and rushed after Conwell, beginning a struggle that spread throughout the apartment. As they wrestled, Conwell was cut repeatedly by the knife.

After defendant stabbed Conwell in the leg a couple of times, both Conwell and the knife fell to the floor. Conwell then stood up, picked up the knife, and came toward defendant. Because Conwell was between defendant and the only door in the room, defendant went to the ledge of a dining room window and lowered himself out of the window. When defendant saw Conwell coming at him with the knife in one hand and a chair in the other hand, he released his hold on the window ledge and fell three stories to the ground below. Defendant attempted to take a few steps before his legs collapsed beneath him.

Defendant testified that he crawled to the back porch of a nearby building, where he fainted. When defendant regained consciousness, it was daylight, and he remained on that porch for the entire day.

Defendant ultimately crawled out of the alley and asked a passerby to call a paramedic.

Defendant stated that he was initially taken by ambulance to Billings Hospital, but was subsequently transferred to Cook County Hospital. Upon admission to the hospital, defendant identified himself using the last name of "Baffield," which is the last name of defendant's father. Defendant also gave the hospital staff his correct address and social security number. Defendant remained in the hospital for seven or eight days and was treated for the fractures in his legs.

Defendant testified that he did not tell any of his family members or any hospital personnel what happened at Conwell's apartment, and he acknowledged that he lied to hospital personnel about the cause of his injuries. Defendant stated that aside from the fractures to his legs caused by his jump from the third-floor window, defendant sustained no other injuries during the altercation with Conwell.

Upon hearing the arguments of counsel and considering the trial court's instructions, the jury found defendant guilty of first degree murder. Defendant subsequently filed a motion for a new trial which was denied by the court. Thereafter, the trial court sentenced defendant to a term of 40 years. Defendant has appealed his conviction.

We initially consider defendant's claim that he was deprived of the right to due process because the prosecutor made improper references to defendant's post-arrest silence.

In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the United States Supreme Court held that the warnings mandated by the *Miranda* decision operate as a prophylactic means of safeguarding fifth amendment rights and that silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. (*Doyle*, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244.) The Supreme Court held further that because of the nature of the warnings the State is required to give to the person arrested, every post-arrest silence is "insolubly ambiguous." *Doyle*, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244.

Although the *Miranda* warnings do not contain an express assurance that silence will carry no penalty, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. (*Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.) Thus, a defendant's silence at the time of arrest and after receiving *Miranda* warnings may not be used for impeachment purposes, and such use violates the due process clause of the fourteenth amendment. *Doyle*, 426 U.S. at 619, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245. See also

*People v. Moody* (1990), 199 Ill. App. 3d 455, 464, 557 N.E.2d 335, 341; *People v. Johnson* (1988), 170 Ill. App. 3d 828, 834, 525 N.E.2d 546, 551.

Yet, the rule established in *Doyle* is subject to certain exceptions. The State may properly comment on post-arrest silence where the defendant asserts at trial that he gave his exculpatory statement to the police when arrested. In such a situation, the defendant may be impeached with evidence that he did not do so. (*Johnson*, 170 Ill. App. 3d at 834, 525 N.E.2d at 551.) In addition, where the defendant's exculpatory testimony at trial is manifestly inconsistent with statements made after arrest, the State may present evidence or comment on the defendant's failure to give the same statement at the time of arrest. (*Johnson*, 170 Ill. App. 3d at 834, 525 N.E.2d at 551.) Finally, a defendant may be impeached by evidence of silence prior to arrest and prior to receipt of the *Miranda* warnings. (*Jenkins v. Anderson* (1980), 447 U.S. 231, 240, 65 L. Ed. 2d 86, 96, 100 S. Ct. 2124, 2130.) Where the defendant's failure to speak has occurred before the petitioner was taken into custody and given the *Miranda* warnings, it is clear that the defendant's silence was not induced by governmental action. (*Jenkins*, 447 U.S. at 240, 65 L. Ed. 2d at 96, 100 S. Ct. at 2130.) In such circumstances, the fundamental unfairness recognized in *Doyle* is not present, and the introduction of prearrest silence does not constitute a violation of the fourteenth amendment. *Jenkins*, 447 U.S. at 240, 65 L. Ed. 2d at 96, 100 S. Ct. at 2130.

■■ In the instant case, the record reveals that during his cross-examination of the defendant, the prosecutor inquired as follows:

> "[PROSECUTOR]: And of course, when you got out of [Conwell's apartment] you called the police and told them, 'Hey, this guy attacked me with a big knife'?
>
> [DEFENDANT]: No, I didn't.
>
> [PROSECUTOR]: You never told anybody that, did you?
>
> [DEFENDANT]: No.
>
> [PROSECUTOR]: In fact, this story you told the ladies and gentlemen of the jury here today in court, when was the first time you told that story to anyone?"

Defense counsel's objection to this question was initially overruled, but after a sidebar, the trial judge sustained the objection.

This question makes no reference to defendant's silence after his arrest and receipt of *Miranda* warnings. Rather, it is a general inquiry as to whether defendant had ever told anyone about Conwell's homosexual advance and attack with the butcher knife. We hold that this question was permissible, especially in light of the fact that

defendant had the opportunity to speak with family members and medical care providers long before he was arrested and given the warnings required under *Miranda*. Clearly, this prearrest silence may be used to impeach a defendant who presents exculpatory evidence at a later trial. (*Jenkins*, 447 U.S. at 240, 65 L. Ed. 2d at 96, 100 S. Ct. at 2130.) We hold that the prosecutor's cross-examination of the defendant on this subject was appropriate because defendant was not arrested or given *Miranda* warnings until more than five weeks after the death of Conwell.

Moreover, we note that the objection to this question was ultimately sustained by the trial judge. Consequently, any potential error caused by this question was cured by the trial court's ruling on the objection. *People v. Shum* (1987), 117 Ill. 2d 317, 348, 512 N.E.2d 1183, 1194, *cert. denied* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108 S. Ct. 1060.

In response to subsequent examination by the prosecutor, defendant admitted that he had lied to hospital personnel about the cause of his injuries and that he did not tell hospital personnel or any of his family members how he sustained his injuries or what had happened in Conwell's apartment. Defense counsel did not object to any of this questioning by the prosecutor.

■■ The prosecutor subsequently questioned defendant as follows:

"[PROSECUTOR]: You got arrested on this murder charge approximately 14 months ago, correct?

[DEFENDANT]: Yes.

[PROSECUTOR]: November of 1987, correct?

[DEFENDANT]: Yes.

[PROSECUTOR]: And during the past 14 months you have had time to think about what you would say at your trial, correct?"

The trial court overruled defense counsel's objection to this question.

We hold that this examination did not refer to post-arrest silence by defendant, but merely inquired as to whether after his arrest defendant had time to think about his trial testimony. It would be virtually impossible for defendant to not think at all about his future testimony during the time period before the trial commenced. We perceive these questions to be almost rhetorical. Thus, in our view, these questions cannot be considered prejudicial as an improper reference to defendant's post-arrest silence.

During rebuttal closing argument, the prosecutor stated:

"[PROSECUTOR]: You know the defendant had about 14 months to think up the story."

Defense counsel's objection to this statement was overruled.

■■ We find that this argument did not refer to defendant's post-arrest silence, but rather to the evidence adduced at trial that defendant had 14 months to contemplate his trial testimony.

A prosecutor is given wide latitude during closing argument, and the trial court's determination of the propriety of closing argument will generally be followed absent a clear abuse of discretion. (*People v. Harris* (1990), 196 Ill. App. 3d 663, 675, 554 N.E.2d 367, 375; *People v. Dodds* (1989), 190 Ill. App. 3d 1083, 1097, 547 N.E.2d 523, 534.) Arguments based on facts or reasonable inferences drawn from the facts are within the scope of proper argument even where they reflect unfavorably on the accused. *Shum*, 117 Ill. 2d at 348, 512 N.E.2d at 1194; *People v. Albanese* (1984), 102 Ill. 2d 54, 78, 464 N.E.2d 206, 218, *cert. denied* (1984), 469 U.S. 892, 83 L. Ed. 2d 205, 105 S. Ct. 268; *Harris*, 196 Ill. App. 3d at 675, 554 N.E.2d at 367; *People v. Bracy* (1986), 152 Ill. App. 3d 566, 576, 504 N.E.2d 764, 770-71.

Defendant specifically admitted on cross-examination that he had thought about his testimony prior to the commencement of the trial. Thus, the prosecutor's statement during rebuttal closing argument was permissible because it constituted fair comment on the evidence that had been presented to the jury.

Because the trial court is in the best position to determine the prejudicial effect, if any, of a remark made during argument, the character and scope of argument to the jury is left largely to the trial court, and every reasonable presumption must be indulged in that the trial judge has performed his duty and properly exercised the discretion vested in him. *People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 327; *People v. Pittman* (1984), 126 Ill. App. 3d 586, 594, 467 N.E.2d 918, 925.

Based upon the record before us, we do not believe defendant has established that he was deprived of the right to a fair trial by any improper questioning or argument by the prosecutor which referred to defendant's post-arrest silence. See *Pittman*, 126 Ill. App. 3d at 594, 467 N.E.2d at 925.

We next address defendant's assertion that he was deprived of a fair trial by improper comments by the prosecutor during opening statements and closing arguments.

Although every defendant is entitled to a trial that is free from improper comments or arguments that engender prejudice, a conviction will not be disturbed on review unless such remarks constitute a material factor in the conviction, or result in substantial prejudice to the accused. *People v. Johnson* (1987), 119 Ill. 2d 119, 139-40, 518

N.E.2d 100, 109-10, *cert. denied* (1988), 486 U.S. 1047, 100 L. Ed. 2d 629, 108 S. Ct. 2027; *People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746, 750; *People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200, 1205.

In determining whether the prosecutor's comments or arguments constituted prejudicial error, the test employed is whether the jury would have reached a contrary verdict had the improper remarks not been made. (*Pittman*, 126 Ill. App. 3d at 594, 467 N.E.2d at 925; *People v. Witted* (1979), 79 Ill. App. 3d 156, 165, 398 N.E.2d 68, 76.) In making this determination, reference must be made to the content of the language used, its relation to the evidence, and the effect of the argument on the rights of the accused to a fair and impartial trial. (*Witted*, 79 Ill. App. 3d at 165, 398 N.E.2d at 76; *People v. Mitchell* (1975), 35 Ill. App. 3d 151, 164, 341 N.E.2d 153, 163.) As previously noted, every reasonable presumption must be indulged in that the trial judge has performed his duty and properly exercised the discretion vested in him. *Smothers*, 55 Ill. 2d at 176, 302 N.E.2d at 327.

■ In the case at bar, defendant asserts that he was prejudiced by the prosecutor's comment during opening statements that while standing outside the door of Conwell's apartment, Dennis Ware heard "a male voice yelling something to the effect, okay, motherfucker; you're going to get it now." Although defense counsel made no objection to this comment during opening statements, defendant argues that it was improper and prejudicial because at trial Ware testified only that he heard a male voice say "okay, motherfucker." Defendant contends that the additional phrase, "you're going to get it now" constituted a threat to Conwell's life but was not testified to by Ware at trial.

Although Ware did not testify at trial that he heard this additional phrase, the prosecutor stated at the hearing on defendant's motion for a new trial that he included this phrase in his opening statement because it was a quote from police reports of what Ware told the officers. The prosecutor also stated that during a pretrial conference in preparation for testimony, Ware included that phrase as a part of the events he saw and heard on the night of Conwell's death. The prosecutor explained that Ware apparently forgot to include this phrase when he actually took the stand to testify. Upon consideration of the arguments of counsel, the trial judge denied defendant's motion for a new trial, specifically finding that defendant had not been prejudiced by this comment.

Thus, the record indicates that the prosecutor had no way of knowing that Ware's memory would fail as to this statement. (See

*People v. Wills* (1987), 153 Ill. App. 3d 328, 342-43, 505 N.E.2d 754, 763.) Based upon the record as a whole, we hold that this remark did not constitute a material factor in defendant's conviction or result in substantial prejudice to him. Consequently, defendant has not established that he is entitled to a new trial on the basis of this comment, and the trial court properly denied his motion for a new trial.

■ Defendant also refers to the prosecutor's comment during opening statements that when he looked through the window of the back door to Conwell's apartment, Ware "saw a horrible sight, a sight that will last with him the rest of his life." Ware testified that when he looked through the window of the back door, he saw Conwell's legs lying over the stereo and Ware assumed that he was dead.

Although Ware did not specifically state that it was a "horrible sight," we do not find it unreasonable for the prosecutor to describe the scene in such a fashion where Conwell was Ware's brother-in-law, living in Ware's building, and someone whom Ware had known for 17 years. In addition, we cannot say that this comment can be attributed to deliberate misconduct by the prosecutor which resulted in substantial prejudice to defendant. See *Wills*, 153 Ill. App. 3d at 342, 505 N.E.2d at 763.

■ Defendant contends further that the prosecutor made several remarks during closing arguments which were improper and prejudicial.

Specifically, defendant asserts that the prosecutor erroneously referred to the number of police officers in the area of Conwell's apartment after the body was discovered where no such evidence had been elicited. The transcript of the trial indicates that the prosecutor stated "you can imagine how many squad cars are going to be arriving at the scene. *** Now, if you had just been attacked and tried to escape with your life, wouldn't you want to talk to the police? Wouldn't you want to tell them what happened?"

Thus, this comment clearly was intended to call the jury's attention to defendant's prearrest silence. It was not an impermissible reference to the number of police officers responding to the scene of the crime and did not unfairly prejudice the defendant. Moreover, the evidence adduced at trial established that at least five law enforcement officials arrived on the scene in addition to the paramedics who responded to the call for medical assistance. Consequently, the prosecutor's comment was proper based upon this evidence.

Defendant also complains that the prosecutor stated that the loud noises heard by the Wares was Conwell "attempting to get away from the attacker." This comment was proper comment on the evidence ad-

duced at trial and the inferences that can be fairly drawn therefrom. (See *Shum*, 117 Ill. 2d at 348, 512 N.E.2d at 1194; *Albanese*, 102 Ill. 2d at 78, 464 N.E.2d at 218; *Harris*, 196 Ill. App. 3d at 675, 554 N.E.2d at 375.) Both Dennis and Ann Ware testified that they heard loud noises coming from Conwell's apartment. Dennis Ware stated that he heard Conwell call repeatedly for help. Kirschner testified that Conwell's wounds were consistent with those normally recognized to be defense wounds, and defendant testified that he sustained absolutely no injuries inflicted by Conwell. Consequently, the prosecutor's comment was proper based on the evidence presented to the jury at trial.

During rebuttal closing argument, the prosecutor responded to defense counsel's argument that defendant acted in self-defense by arguing that defendant was a "cold-blooded murderer." The prosecutor argued further to the jury that "[i]f you think through the hocus-pocus, mumbo jumbo, bunch of lies *** [f]rom that witness stand, you will see what a liar is. But you have to think through what he told you, take a closer look, and you will see it doesn't hold up."

The prosecutor is entitled to comment on the accused's credibility (*People v. Carter* (1988), 177 Ill. App. 3d 593, 601, 532 N.E.2d 531, 536) and may comment on the evidence presented at trial and the inferences to be drawn therefrom (*Shum*, 117 Ill. 2d at 348, 512 N.E.2d at 1194; *Albanese*, 102 Ill. 2d at 78, 464 N.E.2d at 218). In addition, it is not improper to call the defendant a "liar" if conflicts in the evidence make such an assertion a fair inference. *People v. Tiller* (1982), 94 Ill. 2d 303, 319, 447 N.E.2d 174, 182, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121; *People v. Townsend* (1985), 136 Ill. App. 3d 385, 395, 483 N.E.2d 340, 347.

The evidence established that Conwell repeatedly called for help and that the 28 stab wounds which caused him to bleed to death were characterized as defense wounds. It was also undisputed that defendant sustained no stab wounds or other injuries inflicted by Conwell. In this instance, it was within the bounds of permissible argument for the prosecutor to challenge the veracity of the defendant's trial testimony and to argue that defendant's account of the events on September 27, 1987, did not coincide with the other evidence presented to the jury.

Defendant also complains that he was deprived of the right to a fair trial by the prosecutor's suggestion that his testimony that "Baffield" was his father's name was untrue.

Although the State did not present any evidence which contradicted defendant's assertion that his father's name was "Baffield,"

we find that this comment was not a material factor in defendant's conviction or caused substantial prejudice against the defendant. Consequently, defendant's conviction will not be reversed on this basis. See *Johnson*, 119 Ill. 2d at 139-40, 518 N.E.2d at 109-10; *Terry*, 99 Ill. 2d at 517, 460 N.E.2d at 750; *Baptist*, 76 Ill. 2d at 29, 389 N.E.2d at 1205.

Defendant next asserts that the prosecutor improperly argued that his testimony was "concocted in the hopes that he could sell [the jury] on this theory of second degree murder *** [because] he knows you're not going to buy a not guilty [verdict]." As noted above, the prosecutor is entitled to comment on the accused's credibility (*Carter*, 177 Ill. App. 3d at 601, 532 N.E.2d at 536), and it is not improper to argue that the defendant has testified falsely if conflicts in the evidence make such an assertion a fair inference (*Tiller*, 94 Ill. 2d at 319, 447 N.E.2d at 182; *Townsend*, 136 Ill. App. 3d at 395, 483 N.E.2d at 347). Based upon the record as a whole, it was within the bounds of permissible argument for the prosecutor to challenge the veracity of the defendant's trial testimony and to argue that defendant's account of the events on September 27, 1987, did not coincide with the other evidence presented to the jury.

Defendant also contends that it was error for the prosecutor to suggest two alternative theories as to what transpired prior to Conwell's death on September 27, 1987. The record indicates that the trial judge repeatedly advised the jury that they were to consider only the evidence presented at trial, that the comments made by counsel during opening statements and closing arguments were not evidence, and that such comments should be disregarded when not based upon evidence adduced during the trial. Consequently, any prejudice which might have resulted from these remarks was offset by the trial court's admonishments to the jury. See *People v. Jennings* (1986), 142 Ill. App. 3d 1014, 1025, 492 N.E.2d 600, 606-07; *Townsend*, 136 Ill. App. 3d at 394-95, 483 N.E.2d at 347.

Defendant argues further that it was improper for the prosecutor to refer to him as a "depraved human being."

Although the prosecutor may comment unfavorably on the defendant and the evil results of crime, he may not attempt to inflame the passion of the jury or arouse the prejudice of the jury against the defendant. (*Johnson*, 119 Ill. 2d at 139, 518 N.E.2d at 109; *People v. Alexander* (1984), 127 Ill. App. 3d 1007, 1014, 470 N.E.2d 1071, 1077, *cert. denied* (1985), 471 U.S. 1019, 85 L. Ed. 2d 308, 105 S. Ct. 2027.) Yet, even where the State has characterized the defendant as an "animal," such improper remarks have been held to be harmless error un-

less they constitute a material factor in the conviction or result in substantial prejudice to the accused. *Johnson*, 119 Ill. 2d at 139-40, 518 N.E.2d at 109-10; *Alexander*, 127 Ill. App. 3d at 1014, 470 N.E.2d at 1077.

In light of the fact that the trial judge admonished the jury on more than one occasion that comments made by counsel during opening statements and closing arguments were not evidence and that such comments should be disregarded when not based upon evidence adduced during the trial, any prejudice which might have resulted from these remarks was offset by the trial court's admonishments to the jury. (See *Jennings*, 142 Ill. App. 3d at 1025, 492 N.E.2d at 606-07; *Townsend*, 136 Ill. App. 3d at 394-95, 483 N.E.2d at 347.) Thus, we hold that the prosecutor's comment in the case at bar was not so inflammatory as to constitute a material factor in the conviction or to result in substantial prejudice to the defendant.

Finally, defendant asserts that the cumulative effect of the prosecutor's comments substantially prejudiced the jury. This argument is unpersuasive. It has been held that the whole can be no greater than the sum of its parts. (*Albanese*, 102 Ill. 2d at 82-83, 464 N.E.2d at 220.) Thus, where defendant has failed to establish that any individual comments require reversal, a court of review will not order a new trial based upon the "cumulative effect" of alleged errors. *Albanese*, 102 Ill. 2d at 83, 464 N.E.2d at 220.

Based upon the record before us, we do not believe defendant has established that his conviction should be reversed or that he is entitled to a new trial as a result of improper comment by the prosecutor.

Defendant also contends that the trial court erred in failing to instruct the jury that an attorney has the right to interview witnesses. Defendant asserts that the trial court should have issued defendant's tendered instruction Illinois Pattern Jury Instructions, Criminal, No. 3.10 (2d ed. 1981) (IPI Criminal 2d No. 3.10), which provides as follows:

> "An attorney has the right to interview a witness for the purpose of learning the testimony the witness will give." (IPI Criminal 2d No. 3.10.)

The Committee Note to instruction 3.10 provides that this instruction should not be given unless there has been examination eliciting prior interviews.

The Committee Note also refers to the corresponding civil instruction which states as follows:

> "An attorney has a right to interview a witness for the purpose of learning what testimony the witness will give. The fact

that the witness has talked to an attorney and told him what he would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness." Illinois Pattern Jury Instructions, Civil, No. 2.06 (2d ed. 1971) (IPI Civil 2d No. 2.06).

The Notes on Use for IPI Civil 2d No. 2.06 indicate that this instruction may only be given where the evidence shows that a witness or party has been interviewed by an attorney. This civil instruction has been interpreted to be an attempt to offset the ancient trick in which an attorney questions a witness as to his interview with opposing counsel, often stated in a way to imply to the witness and jurors that this is an impropriety. *Dorf v. Egyptian Freightways, Inc.* (1962), 39 Ill. App. 2d 2, 4, 188 N.E.2d 103, 104.

The purpose of giving IPI Criminal 2d No. 3.10 is to prevent adverse inferences from a witness speaking with opposing counsel prior to trial. *People v. Simmons* (1985), 138 Ill. App. 3d 492, 498, 485 N.E.2d 1135, 1140.

■ In the instant case, defendant claims that this instruction was necessary because during his cross-examination of the defendant, the prosecutor inquired as to whether defendant had previously seen the photographs depicting bloody footprints on the gangway beneath the third-floor window in Conwell's apartment. When questioned as to the reason the footprints faced the building next door, defendant explained that he had turned around in the air as he fell from the window. Defendant also acknowledged that he had seen these photographs before the trial commenced.

This evidence did not establish that defendant had engaged in prior interviews with counsel. Moreover, the questioning by the prosecutor did not imply that any improper consultation took place or that defendant's testimony had been altered or fabricated as a result of such a consultation.

The function of jury instructions is to convey the correct principles of law applicable to the evidence submitted to the jury. Jury instructions enable the jury to apply the proper legal principles to the facts and arrive at a correct conclusion according to the law and the evidence. (*People v. Jones* (1986), 145 Ill. App. 3d 835, 838, 495 N.E.2d 1371, 1373.) A tendered instruction should be refused where there is no evidence to support that proffered instruction. (*People v. Mitchell* (1985), 136 Ill. App. 3d 205, 208, 482 N.E.2d 1046, 1048.) Instructions should not be given if they do not accurately state the law or if they are misleading or confusing. *Jones*, 145 Ill. App. 3d at 838, 495 N.E.2d at 1373.

Because the evidence before the jury did not establish that defendant had engaged in pretrial interviews with counsel or that such interviews were improper, the trial court acted properly in refusing the tendered instruction.

Defendant also argues that he was not proven guilty of murder beyond a reasonable doubt because he acted in self-defense after being attacked by Conwell.

Section 7—1 of the Criminal Code of 1961 provides as follows:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1987, ch. 38, par. 7—1.

Killing in self-defense is justified where the following elements are present: (1) force has been threatened against a person; (2) the threatened person is not an aggressor; (3) the danger of harm is imminent; (4) the force threatened is unlawful; and (5) the defendant must reasonably believe that danger exists, that the use of force is necessary to avert the danger and that the kind and amount of force which he uses is necessary. *People v. Parker* (1990), 194 Ill. App. 3d 1048, 1055, 551 N.E.2d 1012, 1017; *People v. Kyles* (1980), 91 Ill. App. 3d 1019, 1021-22, 415 N.E.2d 499, 501.

Self-defense is an affirmative defense. (Ill. Rev. Stat. 1987, ch. 38, par. 7—14.) Where the defendant presents some evidence tending to prove this affirmative defense, the burden then rests upon the prosecution to prove guilt beyond a reasonable doubt as to the issue of self-defense and all of the elements of the offense charged. Ill. Rev. Stat. 1987, ch. 38, par. 3—2(b); *Parker*, 194 Ill. App. 3d at 1055, 551 N.E.2d at 1017.

Although one does not have to retreat from a place where he has a right to be, the nonaggressor may use force likely to cause death or serious bodily harm only if he reasonably believes that the imminently threatened force had placed him in danger of death or great bodily harm. (*People v. Moore* (1976), 43 Ill. App. 3d 521, 526, 357 N.E.2d 566, 570.) Whether the facts and circumstances would induce a reasonable apprehension of serious bodily harm is a question of fact to be determined in light of the defendant's perception of the situation at the time he employed force against his aggressor. (*People v. Sawyer*

(1986), 115 Ill. 2d 184, 193, 503 N.E.2d 331, 335, *cert. denied* (1987), 482 U.S. 930, 96 L. Ed. 2d 702, 107 S. Ct. 3216.) That determination will not be disturbed by a reviewing court unless the evidence was so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt as to the defendant's guilt. *People v. Balfour* (1986), 148 Ill. App. 3d 215, 222, 498 N.E.2d 547, 553.

Defendant argues, in the alternative, that even if he held an unreasonable belief in the need for self-defense, then the appropriate charge would have been second-degree murder. In support of this argument, defendant asserts that the only evidence as to the events in Conwell's apartment was that presented through the testimony of the defendant himself. Defendant contends further that the jury's verdict was erroneous because his testimony was uncontradicted.

■ Careful review of the record reveals, however, that there was ample evidence for the jury to conclude that defendant knowingly and intentionally inflicted 28 stab wounds, causing Conwell's death as a result of excessive bleeding, and that defendant did not have a reasonable or unreasonable belief that such conduct was necessary in order to prevent death or great bodily harm to himself or another.

Ware testified that he heard Conwell yell repeatedly for help and that he heard another male voice say, in an aggressive tone, "okay, motherfucker, okay motherfucker." Conwell's body was found lying backward over a stereo cabinet, with a telephone in one hand and a gas bill in the other hand. Conwell's death was caused by the 28 stab wounds inflicted by defendant. Yet, defendant testified that he sustained no cuts, stab wounds, or other injuries inflicted by Conwell. In addition, defendant waited almost 36 hours before seeking treatment for the fractures in his legs. When he did finally seek treatment, defendant stated that his last name was "Baffield" and lied to the hospital personnel as to the cause of his injuries. Defendant never told any of his family members or any hospital personnel what transpired in Conwell's apartment during the early morning hours of September 27, 1987. Moreover, no handprints were found on the window ledge in Conwell's apartment despite the fact that defendant contended that he had hung from the ledge to lower himself out of the window before falling to the gangway below.

It is the function of the trier of fact to determine the credibility of the witnesses. (*Parker*, 194 Ill. App. 3d at 1056, 551 N.E.2d at 1018.) The jury had the opportunity to view the demeanor of the defendant and to weigh his testimony. Upon consideration of all of the evidence presented, the jury determined that defendant's testimony was not credible, and we must agree. Many of Conwell's wounds were on his

back and on the back of his head and neck. We find it difficult to believe that these injuries could have been inflicted by Conwell himself as defendant testified. In addition, there is no dispute that defendant fled from Conwell's apartment by jumping from a third-floor window. Defendant did not seek out the police and explain how he had been the victim of an attack by Conwell. After defendant was discharged from the hospital, he travelled to Mariana, Arkansas, where he was ultimately arrested. Based upon this evidence, we cannot say that the evidence was so improbable, unreasonable, or palpably erroneous so as to leave a reasonable doubt that defendant was guilty of murder.

Finally defendant contends that the homicide statute under which he was convicted is violative of the Illinois and United States constitutions. Specifically, defendant asserts that the homicide statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—1 *et seq.*) is contrary to his constitutional rights to due process and equal protection and of the guarantee of separation of powers.

■ This court has recently considered and rejected the arguments raised by defendant here. See *People v. Gore* (1991), 212 Ill. App. 3d 984, 993-97, 571 N.E.2d 1041, 1046-49.

In *Gore*, the court relied upon *Patterson v. New York,* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319, and concluded that a defendant's right to due process is not prejudiced where the statute requires the prosecution to prove all of the elements of the crime charged. Thus, although the burden of proof is shifted to the defendant to establish an affirmative defense, the statutory scheme is not violative of the due process clause. *Gore*, 212 Ill. App. 3d at 993, 571 N.E.2d at 1047. See also *People v. Jerome* (1990), 206 Ill. App. 3d 428, 564 N.E.2d 221; *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.

The court in *Gore* also held that the homicide statute did not violate the right to equal protection. The court relied upon *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319, and upon *People v. Kaeding* (1983), 98 Ill. 2d 237, 456 N.E.2d 11, in concluding that the defendant had not established that the statutory scheme under which he was convicted should be subject to a strict scrutiny analysis. (*Gore*, 212 Ill. App. 3d at 994-95, 571 N.E.2d at 1047-48.) Rather, the court found that the homicide statute actually affords a criminal defendant charged with murder the opportunity to establish a defense which lessens his punishment and that this opportunity is not provided other criminal defendants. (*Gore*, 212 Ill. App. 3d at 995, 571 N.E.2d at 1048.) The court concluded that the homicide statute is rationally designed to meet a legitimate State purpose and,

therefore, is not violative of the equal protection clause. *Gore*, 212 Ill. App. 3d at 995-96, 571 N.E.2d at 1048. See also *People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373.

Finally, the decision in *Gore* determined that the homicide statute was not violative of the separation of powers provision of the Illinois Constitution. (Ill. Const. 1970, art. II, §1.) The court held that the statute does not preclude the State's Attorney from charging a defendant with second-degree murder. (*Gore*, 212 Ill. App. 3d at 996, 571 N.E.2d at 1048-49.) The court noted that the State may charge second-degree murder where there is proof of the elements of first-degree murder but there is also present a mitigating factor as specified in section 9—2 of the homicide statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—2). Under such circumstances, the defendant would not bear the burden of establishing the mitigating factors, and the jury would be so instructed in the appropriate case. (*Gore*, 212 Ill. App. 3d at 996, 571 N.E.2d at 1049; *People v. Burks* (1989), 189 Ill. App. 3d 782, 545 N.E.2d 782.) The *Gore* court concluded that because a defendant is required to prove a mitigating factor only where he has been charged with first-degree murder, the homicide statute does not violate the guarantee of the separation of powers. *Gore*, 212 Ill. App. 3d at 996-97, 571 N.E.2d at 1049.

Consequently, defendant has not established that the statutory scheme under which he was convicted is violative of the separation of powers provision or of his constitutional rights to due process and equal protection.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RAKOWSKI, P.J., and McNAMARA, J., concur.